318 Ga. 673
FINAL COPY

S24A0026. HASSAN v. THE STATE.

ELLINGTON, Justice.

A Fulton County jury found Muhammad Hassan guilty of participation in street gang activity, murder, six counts of aggravated assault, and firearms charges in connection with a drive-by shooting that resulted in the death of Amira Cameron.[1] Hassan

[1] The shooting occurred on October 4, 2015. On March 18, 2016, a Fulton County grand jury returned an indictment charging Hassan and Jamaris Zinnerman with participation in criminal street gang activity through commission of the offenses of murder and aggravated assault with a deadly weapon (Count 1); malice murder (Count 2); felony murder predicated on aggravated assault with a deadly weapon (Count 3); aggravated assault with a deadly weapon against Amira Cameron (Count 5); and possession of a firearm during the commission of a felony (Count 13). The grand jury also indicted Hassan and Zinnerman with aggravated assault with a deadly weapon against Myles Cameron (Count 6), Jeremecia Perry (Count 7), Jamario Calloway (Count 8), Aquantis Hillman (Count 9), Dujuan Terry (Count 10), Terrene Ja'Quan Perry (Count 11), and Josiah Wade (Count 12), and possession of a firearm during the commission of a felony (Count 13). The grand jury indicted Hassan individually with possession of a firearm by a first offender probationer (Count 14) and an additional count of felony murder of Amira Cameron (Count 4) predicated on the weapons charge. Hassan and Zinnerman were tried jointly in May 2019. The jury found Hassan guilty on Counts 1 through 7, 9 through 11, 13, and 14; the State entered nolle prosequi on Counts 8 and 12. The jury also found Zinnerman guilty of Counts 1 through 3, 5 through 7, 9 through 11, and 13. On May 28, 2019, the trial court sentenced

contends that the trial court committed plain error by allowing hearsay evidence regarding a prior drive-by shooting. In addition, Hassan contends that the trial court committed plain error in failing to instruct the jury about the State's "heightened burden of proof under OCGA § 24-14-6," which requires the exclusion of every reasonable hypothesis other than guilt when the case against the accused rests entirely on circumstantial evidence. For the reasons explained below, we affirm.

Pertinent to Hassan's arguments on appeal, the evidence presented at trial showed the following. At approximately 8:20 p.m. on October 4, 2015, a gold- or champagne-colored Chevrolet Malibu entered the parking lot of the Oakley Shoals Apartments in Fulton County. Quin Vann, a resident of the complex, testified that she heard gunfire outside of her apartment that night. She ran out to

---

Hassan to serve life in prison plus 25 years in prison. The trial court determined that Count 5 merged for purposes of sentencing. The trial court also declared that Counts 3 and 4 were vacated as a matter of law. Hassan filed a timely motion for a new trial, which he amended on July 15, 2021, June 1, 2022, and March 27, 2023. After a hearing on March 29, 2023, the trial court denied Hassan's motion for a new trial on April 7, 2023. Hassan filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2023 and submitted for a decision on the briefs.

see what had happened and saw a champagne-colored Chevy Malibu with all its windows down drive past and then exit the parking lot. Vann called 911 to report the shooting at 8:21 p.m.

When the Malibu entered the parking lot, several teenagers who were friends and acquaintances from around the neighborhood were standing near the entrance. The group included Aquantis Hillman, Amira Cameron, Myles Cameron, Ja'Quan Perry, Jeremecia Perry, Dujuan Terry, and others. Five members of the group testified at Hassan's trial.

Myles Cameron testified that there were four or five people in the Malibu, all of whom appeared to be staring at his group through the passenger-side windows as the car drove slowly by. Terry and Hillman also testified that they saw four or five people in the car, and all of them had their heads turned in the group's direction as they drove by. Uneasy, the group of teens crossed to the other side of the street. Myles Cameron testified that Terry retrieved a ".38 revolver" from Perry's bookbag and held it at his side, although Terry testified that he did not have a gun and Perry testified that

3

she did not have a bookbag or a gun with her that night. Myles Cameron, Perry, and Hillman testified that the driver of the Malibu turned around at the far end of the parking lot, turned off the headlights, and drove back toward the group. Hillman testified that the Malibu's windows were open and at least two occupants of the car were holding guns out of the front and rear passenger-side windows. The car's occupants then started shooting in the teenagers' direction. Myles Cameron's 15-year-old sister, Amira Cameron, received a fatal gunshot wound to the right side of her head; everyone else in the group escaped injury.

At the time of the shooting, Jamaris Zinnerman, a member of the Smash Krew Billy Gang ("SKBG"), was under court supervision and wore an ankle monitor that included a GPS transmitter. Records from that transmitter showed that at 8:19 p.m. Zinnerman's monitor was at the entrance of the Oakley Shoals Apartments and then was in the parking lot where the shooting occurred at 8:20 p.m. The transmitter records showed that the monitor was on a nearby parkway leaving the scene at 8:22 p.m.; was at South Fulton

4

Hospital on Cleveland Avenue at 8:34 p.m.; left that hospital at 9:40 p.m.; and arrived at Atlanta Medical Center at 9:56 p.m.

Hassan testified that he drove his mother's Malibu to the Oakley Shoals Apartments on the night of the shooting and that Zinnerman rode in the rear passenger seat. Hassan testified that three "acquaintances," who had been at a party that he had attended that night and had asked him for a ride home, were also in the car; one passenger asked to be dropped off at the Oakley Shoals Apartments. Hassan testified that before beginning the drive, he asked his passengers whether anyone was carrying a gun, because "[b]efore [he] even let anybody in [his] car [he would] make sure" they did not have a gun. Hassan admitted that he passed a group of people who were standing right in front of the entrance to the complex and testified that they were "looking crazy" at the occupants of the car and some seemed to be "clutching," which he defined as reaching for weapons. Hassan testified that, based on that behavior, he decided not to stop to drop off his passenger and instead turned around, and again passed the group, which had

5

crossed the street. Then, Hassan heard gunshots and sped away. He testified that he was certain that no one was shooting out of his car. In particular, Hassan testified that he did not have a gun that night and that he did not shoot anyone. He testified that, after they left the Oakley Shoals Apartments, Zinnerman told him he had been shot. Hassan saw that Zinnerman was bleeding. Hassan drove to the nearest hospital and carried Zinnerman inside. Hassan denied being a gang member at the time of trial but admitted he had previously been in a Bloods gang, the Nine Trey Bloods, from age 14 until some unspecified point in 2015. Hassan testified that Zinnerman had been in the Nine Trey Bloods gang and had tattoos that represented the Nine Trey Bloods. Hassan testified that SKBG is not part of the Bloods.

A .38-caliber bullet was removed from Amira Cameron's brain, and a .38-caliber bullet was removed from Zinnerman's body during surgery. Another .38-caliber bullet was found in the Malibu. An expert firearms and tool mark examiner testified that the bullet found in the Malibu and the bullet removed from Zinnerman's body

6

were fired by the same gun, but the bullet that fatally wounded Amira Cameron was fired by a different gun. DNA testing of blood that had soaked into the Malibu's rear seat cushion matched Zinnerman's DNA profile.

In addition to Hillman's testimony about the October 4, 2015 shooting, Hillman testified that he was a member of the Crips gang, a rival of the Bloods gang, and that a person being a "Billy" means he is a Blood. Hillman testified that, days before the shooting at the Oakley Shoals Apartments, members of the Billy Bloods yelled an insult that referred to the rivalry between the Bloods and the Crips and then shot at him. Hillman testified that, in gang culture, one member's having a problem with someone means that the entire gang has a problem with that person, regardless of whether the other members know that person.

An assistant district attorney testified as a criminal street gang expert about the Bloods criminal gang, which has west-coast-affiliated and east-coast-affiliated subsets, and explained that the Smash Krew Billy Gang is a branch of the Nine Trey Billy Bad-ass

7

Bloods, one of the east-coast-affiliated Bloods groups that are predominant in Georgia. The assistant district attorney testified that there is a rivalry and widespread hostility between Bloods gangs and Crips gangs. In particular, at the time of the shooting at the Oakley Shoals Apartments there was hostility locally between the Crips and SKBG members, who blamed the Crips for the unsolved drive-by shooting death of SKBG member Carlton Ramey earlier in 2015. The assistant district attorney testified that, "even to this day," at the time of Hassan's trial in May 2019, "members of the Smash Krew Billy Gang post[ ] pictures of Carlton Ramey or [his nickname] 'Cash' [on social media] as an homage to him because he was killed." The assistant district attorney testified that, around the time of the shooting at the Oakley Shoals Apartments, Zinnerman identified himself as a member of SKBG through photos and captions he posted on social media. A detective testified that Hassan has a five-pointed star tattooed on the right side of his face, which is a common marker of the Bloods, and he had a red bandana in his pocket when he was arrested, which members of the Bloods

commonly wear or carry as "a flag of identification" with the gang. The detective testified that Hillman, a self-identified Crips gang member, was a person of interest in Ramey's death.

In closing argument, the State did not argue that there was any evidence that Hassan fired a weapon that night. The State argued that Hassan was guilty of the murder and the aggravated assaults either as a party to the crime of the actual shooters, by being the driver in the drive-by shooting, or as having participated in a conspiracy to commit the crimes.

1. Hassan contends that all of the evidence about Ramey's murder constituted inadmissible hearsay and that the superior court plainly erred by allowing the evidence. Hassan argues that the State's proposed nexus between his alleged participation in a gang and the offenses arising out of the drive-by shooting at the Oakley Shoals Apartments was that the occupants of his car shot at the group that included Hillman because they blamed Hillman's gang, the Crips, for the murder of Ramey, a fellow member of the shooters' gang, SKBG. See *Overstreet v. State*, 312 Ga. 565, 574 (1) (b) (864

SE2d 14) (2021) (To establish participation in criminal street gang activity in violation of OCGA § 16-15-4, the State must show "some nexus" between the alleged predicate acts and an intent to further the interests of the gang.). Hassan argues that the State "offered no first-hand witness to that other shooting" and that all of the State's evidence about the Ramey murder was elicited during the testimony of the assistant district attorney, who testified as a gang expert, and the detective. Hassan argues that neither witness "was a percipient witness to the drive-by shooting [of Ramey] that they testified about. Both learned about the incident through their investigations, which inevitably comprised the statements of others." Hassan concedes that he did not object to the evidence at trial on the basis that it constituted inadmissible hearsay, but he argues that admitting the evidence constituted plain error.

A trial court's ruling that admits evidence is ordinarily reviewable only where "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]" OCGA § 24-1-

10

103 (a) (1). See *Middlebrooks v. State*, 315 Ga. 671, 687 (2) (a) (884 SE2d 318) (2023). Without preservation of error as provided in OCGA § 24-1-103, an appellate court reviews an evidentiary ruling only for plain error pursuant to OCGA § 24-1-103 (d), which provides that "[n]othing in [that] Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court." See *Middlebrooks*, 315 Ga. at 687 (2) (a).

> To establish plain error, [the appellant] must point to an error that was not affirmatively waived, and that error must have been clear and not open to reasonable dispute, must have affected [the appellant's] substantial rights, and must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

Id. (citation and punctuation omitted). If the appellant fails to meet one element of the plain error test, his claim fails. See *Allen v. State*, 310 Ga. 411, 416 (3) (851 SE2d 541) (2020). "Satisfying all four prongs of [the plain-error] standard is difficult, as it should be." *Williams v. State*, 315 Ga. 490, 495 (2) (883 SE2d 733) (2023) (citation and punctuation omitted). In this case, Hassan failed to

11

meet the second prong, showing an error that was clear and not open to reasonable dispute, because it is not clear that the testimony he challenges was hearsay.

"Hearsay is an out-of-court statement that a party offers into evidence to prove the truth of the matter asserted therein, and such a statement generally is inadmissible at trial." *Smith v. State*, 309 Ga. 240, 245 (2) (b) (845 SE2d 598) (2020). See OCGA §§ 24-8-801 (c); 24-8-802. In his appellate brief, Hassan characterizes as inadmissible hearsay portions of the testimony of the assistant district attorney in which the witness testified that he was "familiar with" the Ramey murder, that Ramey had been a SKBG member, and that there were persons of interest in the investigation but not yet any indictment. As to the other witness, the detective, Hassan characterizes as inadmissible hearsay portions of the detective's testimony in which he testified that Ramey had been a SKBG member, that Ramey was killed in a drive-by shooting prior to the shooting at the Oakley Shoals Apartments, that Hillman identifies himself as a member of the Crips, and that Hillman is a person of

12

interest in the Ramey murder investigation. The detective testified that he "spoke with the detective that was working on [the Ramey case] at the time," but he did not testify about any statement made by that other detective or by any other person.

Neither witness expressly repeated the out-of-court statements of any other person. Although the detective testified that he was "familiar" with the Ramey investigation and referred to speaking with another detective who worked on that investigation, the detective did not specify what that other detective told him or how he developed familiarity with the investigation. Given that, it was not so obvious that the evidence was hearsay such that the trial court should have intervened sua sponte to exclude the testimony. Because Hassan has not shown that allowing the testimony at issue was a clear error that was not open to reasonable dispute, his claim of plain error fails. See *Carter v. State*, 317 Ga. 689, 694 (2) (895 SE2d 295) (2023); *Stafford v. State*, 312 Ga. 811, 820 (3) (b) (865 SE2d 116) (2021); *Strother v. State*, 305 Ga. 838, 848 (4) (d) (828 SE2d 327) (2019).

2. Hassan contends that the trial court erred in failing to instruct the jury regarding the State's "heightened burden of proof" under OCGA § 24-14-6, which provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Again, Hassan concedes that he did not object at trial to the instruction regarding convictions based on circumstantial evidence but argues that the instruction as given constituted plain error. See OCGA § 17-8-58 (b).

The plain error standard with regard to jury instructions, like the standard regarding evidentiary rulings discussed in Division 1, supra, has four requirements: an error that has not been affirmatively waived by the appellant, that is "clear or obvious, rather than subject to reasonable dispute," that affected the appellant's "substantial rights," and that merits a remedy, in the discretion of the appellate court, on the basis that "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Beard v. State*, 317 Ga. 842, 844 (2) (896 SE2d

14

497) (2023) (citation and punctuation omitted). "An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point." *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020) (citations and punctuation omitted). And the appellate court "need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." Id.

Regarding evidence, the trial court instructed the jury:

> Now, your oath requires that you will decide this case based on the evidence. Evidence is the means by which any fact that is put in issue is established or disproved.
> Evidence includes all of the testimony of the witnesses, any exhibits admitted during the trial and stipulations of the attorneys; that is, any fact to which the attorneys have agreed with the approval by the Court.
> Evidence does not include the indictment, the plea of not guilty, the opening and closing remarks of the attorneys or questions asked by the attorneys. Evidence may be direct, circumstantial or both.
> In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You should not be concerned about whether the evidence is direct or circumstantial.
> Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact such

15

as by personally observing or otherwise witnessing that fact.

 Circumstantial evidence is proof of a set of facts and circumstances that tend to prove or disprove another fact by inference; that is, by consistency with such fact or elimination of other facts. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

 You would be authorized to convict only if the evidence, whether direct or circumstantial or both, excludes all reasonable theories of innocence and proves the guilt of the accused beyond a reasonable doubt.

In *Hill*, we considered a plain-error challenge to jury instructions "regarding the level of proof required for conviction" and held that the appellant failed to show that giving the instructions at issue constituted clear or obvious error where the instructions at issue had been upheld by this Court and the appellant cited no controlling authority for the proposition that the instructions were erroneous. See *Hill*, 310 Ga. at 194-195 (11) (a). This Court has upheld a jury instruction that, like the evidence instruction in this case, informed the jurors that they "would be authorized to convict only if the evidence, whether direct, circumstantial, or both, excludes all reasonable theories of innocence

16

and proves the guilt of the accused beyond a reasonable doubt." *Eubanks v. State*, 317 Ga. 563, 580 (3) (a) (894 SE2d 27) (2023). See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Jan. 2023) § 1.30.20. Noting that, "[w]hen a requested jury instruction adds no essential point of law to the existing instructions, it is not error for the trial court to decline to give it[,]" we held that the instructions at issue "effectively conveyed the point that the State was required to disprove reasonable hypotheses of [the appellant's] innocence." *Eubanks*, 317 Ga. at 580 (3) (a). Because the instructions at issue in this case have been upheld by this Court and Hassan has cited no controlling authority for the proposition that the instructions were erroneous, Hassan cannot show plain error. See id.; *Hill*, 310 Ga. at 194-195 (11) (a).

We note that Hassan contends that this Court can consider the harmful effect of the alleged evidentiary error discussed in Division 1 and the alleged instructional error discussed in Division 2 "in the aggregate." Because Hassan has not established clear error in either

instance, we do not reach the issue of whether failing to exclude sua sponte the alleged hearsay or failing to give a jury instruction in language identical to OCGA § 24-14-6 affected Hassan's substantial rights, either individually or in the aggregate.

*Judgment affirmed. All the Justices concur.*

Decided March 19, 2024.

Murder. Fulton Superior Court. Before Judge Cox.

*Bruce S. Harvey; The Bullard Firm, Brandon A. Bullard*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Pareesa H. Amjadi, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Michael A. Oldham, Assistant Attorney General*, for appellee.